

www.SmithandKinglaw.com

LONG ISLAND OFFICE:
666 OLD COUNTRY ROAD
SUITE 305
GARDEN CITY, N.Y. 11530
Telephone: (516) 213-0018
Fax: (917) 591-3244

NEW YORK CITY OFFICE:*
900 THIRD AVENUE, 13TH FLOOR
NEW YORK, N.Y. 10022
Telephone: (212) 681-2800
Fax: (917) 591-3244
*Please send all mail to the Garden City Office

David S. Smith, Esq.†
Brian King, Esq. (1978-2021)
†Admitted in New York and California

September 2, 2025

The Honorable Allyne R. Ross
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

                Re:    *United States v. Feng Jiang*
                        Docket No. 1:24-cr-00264-ARR

Your Honor:

## I.    Introduction

As the Court is aware, our law firm represents Defendant Feng Jiang in the above-referenced matter. On January 10, 2025, Mr. Jiang pled guilty to Money Laundering Conspiracy in violation of 18 U.S.C. § 1956(h). The plea agreement estimates an adjusted offense level of 22, and a criminal history category of I, resulting in an advisory Guidelines range of 41-51 months' imprisonment. Mr. Jiang has also agreed to a forfeiture money judgment in the amount of $2,000,000, which represents his approximate income over the course of five years.

On May 21, 2025, Probation issued its Presentence Investigation Report ("PSR"); the Defendant filed his objections thereto on June 5, 2025; and on June 24, 2025, Probation issued an Addendum to the PSR.

Mr. Jiang's sentencing is scheduled for September 16, 2025. We are writing to submit the Defendant's objections to the PSR, to provide the Court with relevant information regarding Mr. Jiang's personal history, and to respectfully request a non-custodial sentence.

## II.     **Character Letters**

Attached hereto as Exhibit A are letters submitted by the Defendant's family members, friends and pastor. We would respectfully ask the Court to consider such letters in determining a sentence which is sufficient, but not greater than necessary to meet the ends of justice and policy consideration of 18 U.S.C. § 3553(a):

- Meilan Piao (Defendant's wife)
- Yonglu Jiang (Defendant's father)
- Meilan Jiang (Defendant's sister)
- Rev. Ju Ho Kang (Defendant's pastor)
- Shunkang Jin (family friend)
- Hanna Li (family friend)
- Joy Cui (family friend)
- Lianhua Piao (family friend)

## III.    **Personal Background**

Feng Jiang (aka "Jeff" Jiang) was born on February 19, 1982, in Tumen City, China. Tumen City is located in Northeast China, in the Jilin Province – a remote, mountainous region that borders North Korea, where the population speaks a mix of Mandarin and Korean. Feng's father (Yonglu Jiang) worked at the local coal factory, while his mother (Yingzi Jin) cared for Feng and his older sister Meilan.

Feng's parents were devoted caregivers who worked hard to provide for their children. Nevertheless, life in Tumen was austere by American standards; Jilin Province has not experienced the same levels of prosperity and growth as southern China, and as a result, the standard of living lags significantly behind other parts of the country.

Until age 11, Feng was raised in a one-room house in a rural area outside of Tumen City. The room was shared with his extended family members, including grandparents, aunts and uncles. Electricity and running water were intermittent, and Feng – along with his family members – slept upon mats on the floor.

As Yonglu Jiang progressed in his job, he received several promotions, and with those promotions the family's standard of living increased somewhat. When Feng was 11, they moved

into a slightly larger one-room apartment with more reliable utilities. And when he was 14, they moved again into a city apartment which had one bedroom and one common room; for the first time in his life, Feng was able to sleep in a bed.

Feng completed his education at age 20, but upon graduating, he found little in the way of opportunities. Career prospects in Tumen City were grim for a young person, and most of his contemporaries moved away to pursue jobs elsewhere – in Feng's words, "everyone was leaving." In 2005, Feng's sister moved to the United States and settled in Queens, where she found work in a nail salon. In 2007, at age 25, Feng followed his sister to the United States.

Upon arriving, Feng moved into his sister's small Queens apartment. He found employment in nail salons and restaurants, working for several years as a busboy and waiter. In 2008, Feng met Meilan Piao, who was also from the Jilin Province, and the two began dating. In 2013, they welcomed their son E.J. into the world, and the following year they returned home to China to be wed in the presence of their family.

Thereafter, Feng obtained a job working as a salesperson at Pro Care, Inc., an orthopedic shoe store in Queens. His ability to speak both Mandarin and Korean made him a valuable employee, and he remained at Pro Care, saving his money, for five years. During this time, Mr. Feng became a naturalized United States citizen.

While working at Pro Care, Feng met his separately charged co-defendant, Taesong ("Terry") Kim, who was a manager at the store. Kim, who had experience in the pharmacy industry, subsequently left Pro Care to start his own pharmacy business, while Feng remained at Pro Care selling shoes.

In approximately 2016, Mr. Kim approached Feng to solicit his investment (along with several other individuals) in one of Kim's pharmacy locations, called Elmcare Pharmacy. It appeared that Mr. Kim had obtained significant experience and success with his pharmacies and was looking for opportunities for further expansion in the industry. At the time, Feng was working long hours at the shoe store and his son was three years old. While neither Feng nor his wife had disposable income to invest, or any experience in the pharmacy industry, they saw business ownership as a means to a better and more stable life for their family. After discussing the potential risks, Feng and Meilan obtained a $200,000 loan and acquired a stake in Elmcare. At Kim's invitation, Feng would later invest in two other locations: NY Health and 88 Pharmacy.[1]

---

[1] In addition to Elmcare, NY Health and 88 Pharmacy, Taesong Kim also owned and operated three additional pharmacy locations: Huikang, NY Elm, and Silvercare Pharmacy, Inc.

Initially, Feng's role was largely that of a passive investor, as he had no experience in the pharmacy industry. At the time, Elmcare had a manager named Tony who worked closely with Mr. Kim and handled the day-to-day operations. As a result, Feng was able to continue working at his other job and had little involvement with the pharmacy.

In 2019, however, operations at the pharmacy were thrown into disarray when Tony left Elmcare, taking its pharmacist and most of its existing customers with him. At this juncture, Feng, who was working part-time at a restaurant, was forced to take a more hands-on roll in order to save the business. Having no experience in how to run a pharmacy, he stepped in and continued the practices that preceded his day-to-day involvement and began working long hours to keep the pharmacy afloat.[2] Then, in early 2020, the COVID-19 pandemic struck, resulting in even more chaos. Feng worked throughout the darkest periods of the pandemic, personally delivering medication to patients in need – sometimes throwing prescriptions up to windows when his customers were too fearful to step outside. He remained committed to serving his community and, while other pharmacy owners closed their doors to protect their property and health, Feng remained open and provided much-needed medication to customers throughout all five boroughs of New York.

This chaos continued for at least a year, as Feng worked frantically while the business teetered on the edge of bankruptcy. During this time, Feng developed chest pains and worried constantly that he would lose his entire investment, plunging his family into debt. Eventually, as the pandemic receded, the business stabilized.

In 2021, Feng moved into a modest three-bedroom home in Queens purchased by his sister. And in 2022, they were joined at that location by his parents, Yonglu Jiang and Yingzi Jin, who are 73 and 70 years old respectively. As a result, Feng, his wife, son, sister, niece, and parents all currently reside under the same roof.

Feng's life in America has been primarily defined by two things: work and family. Those who know him best describe Feng as a kind and thoughtful individual with an admirable work ethic. For instance, Shunkang Jin, a former co-worker, describes Feng as "one of the most hardworking and sincere individuals I have ever met." Jin relates how Feng went out of his way to host Jin and other immigrants during Chinese holidays, so they would not feel lonely.

---

[2] Unfortunately, it was at this juncture that Feng became aware of and actively involved in the conduct described in the indictment and in Section IV below. Although Feng was not the originator of these practices, which were in place before he became actively involved, they continued under his watch as he worked to keep the business solvent.

Similarly, Hanna Li, a family friend, recounts how she gave birth in middle of the COVID pandemic and could not obtain outside food in the hospital. In response, Feng took it upon himself to prepare seaweed soup and other traditional dishes, bringing them to her in the hospital. As she notes in her letter, "[i]t is through small yet meaningful gestures like these that a person's true character is revealed."

More than anything though, the character letters describe Feng's unwavering dedication to his wife, son and parents. Long-time family friend Joy Cui writes:

> I have known Jeff [Feng] since before we immigrated to the United States, as we are both from the same hometown. Over the many years of our friendship, I have come to know Jeff as a person of exceptional character, deep compassion, and unwavering respect for others – particularly his family. In our hometown, it was common to see Jeff walking with his parents after dinner. These daily acts of care and devotion spoke volumes about his strong sense of filial duty and responsibility.

Likewise, Meilan Piao describes Feng's close bond with their twelve-year-old son, and his ongoing care of his parents:

> While his work ethic is remarkable, it is his devotion as a father that defines him most. From the moment our son was born, Feng has been deeply involved in every aspect of his upbringing. He personally took son to and from school, accompanied him to after-school programs and tutoring, and never missed a parent-teacher meeting. He was there for every cold, every school performance, every small but meaningful moment that matters most in a child's life. Even while managing the daily pressures of running a business, he made it a priority to be home for dinner, help with homework, and provide the emotional security our son needed to grow with confidence and love. He was not just present-he was engaged, attentive, and nurturing. The bond between father and son is unshakable, and I truly believe that our son is the kind, thoughtful boy he is today because of the quiet strength and guidance his father has given him every single day.
>
> In addition to his role as a father, he cared deeply for his elderly parents-regularly taking them to medical appointments and ensuring they were never alone in their struggles. He is the heart of our family, and without him, a crucial part of our lives is missing.

## IV. Defendant's Offense Conduct and Arrest

The pharmacy business which Feng invested in, and helped to operate after 2019, engaged in practices that are regrettably endemic throughout Brooklyn and Queens – namely, the payment of financial incentives to both prescribing doctors and customers, in order to secure and maintain business. Doctors received assistance with rent, salaries, and other financial benefits to refer their patients, while customers were rewarded for their patronage with supermarket gift certificates or cash.

Significantly, Feng was not the author or architect of these practices, which were in place in his community, and at Elmcare, well before his involvement. Nor did he play any role in negotiating with health care providers or structuring the financial arrangements with doctors. However, post 2019, he did assist in carrying out the day-to-day pharmacy operations while knowing that these practices were the norm, and helping to facilitate them. As a result of this involvement, Feng was charged in June of 2024 with multiple counts of fraud, conspiracy, and money laundering.

Both before and after his arrest, Feng met with prosecutors in an effort to assist their investigation. During those meetings, Feng acknowledged, among other things, that pharmacy customers were being provided with financial benefits in exchange for their patronage, that financial transactions were being conducted to facilitate these payments, and that Taesong Kim was paying doctors' operational costs. Feng also acknowledged that this conduct was wrong.

When meetings with the Government did not result in a cooperation agreement, Feng worked quickly to resolve the charges by accepting responsibility and agreeing to restitution and the disgorgement of the monies he earned from the pharmacies. On January 10, 2025, Feng pled guilty to money laundering conspiracy under Count Three of the Indictment. The Plea agreement provides for a forfeiture money judgment of $2,000,000, which roughly represents Feng's approximate total earnings over the five-year period of his involvement with Mr. Kim and the pharmacies. Unlike many engaged in this type of activity, Feng did not use the money derived from it to fund a lavish lifestyle. As mentioned above, he continued to live with his family in his sister's home and the money he derived from the pharmacies was either saved and invested or used to support and provide for his family over that five-year period.

In an effort to fully satisfy this obligation and to demonstrate his acceptance of responsibility and contrition, Feng has agreed to forfeit virtually all his assets, including a JP Morgan Chase account containing approximately $360,000, a stock account at Webull holding

over $315,000 in assets, and a Fidelity stock account with over $850,000 in assets.[3] Feng has also consented to the sale of a commercial property worth approximately $1.5 million and the forfeiture of his share in it (after the satisfaction of a mortgage) to help satisfy his forfeiture obligation.[4] At current values, it is expected that these forfeitures will collectively result in the surrender of over $1.6 million. Such forfeiture is obviously in addition to the mandatory restitution which this Court must also impose.

Since his arrest, Feng and Meilan have been struggling to make ends meet. Meilan has taken employment as a chef at a Korean restaurant, where she is working from 11 a.m. until after midnight, six days a week. The physical demands of the job have taken their toll on Meilan, who suffers from a painful case of frozen shoulder. Worse yet, the grueling and odd hours mean that she rarely sees her son. As a result, Feng has taken over responsibilities at home, including the day-to-day care of their son, driving him to school and picking him up, as well caring for his sister's daughter and his elderly parents.

As his sister Meilan Jiang writes in her letter to the Court:

Today, Feng Jiang is doing everything he can to make things right. With a repentant heart, he has become more present for his wife, whom he had previously neglected due to years of nonstop work. He now cares for his son (who takes the 7 a.m. train to school in Manhattan every day). He is also taking care of his health for the first time in years, visiting the doctor regularly and taking herbal medicine to strengthen his body.

Feng Jiang also helps my family greatly. He picks up my daughter-his niece-every day and even helps prepare dinner for our family. As a devoted Christian, he takes my daughter to church with him every weekend. He has also taken full responsibility for driving our elderly parents to their medical appointments.

V.      **Objections to Presentence Investigation Report**

On June 5, 2025, the undersigned counsel relayed the following objections to Probation in connection with its Presentence Investigation Report. Such objections are reflected in Probation's June 24, 2025 Addendum to the PSR.

---

[3]     The Fidelity stock account is jointly owned by Feng Jiang and Taesong Kim; the proceeds will be divided equally to pay their respective forfeiture obligations.

[4]     As noted below, Feng Jian owns a 33% stake in this real property, and therefore expects its sale to generate approximately $500,000 to pay towards his forfeiture judgment.

Paragraph 72

Paragraph 72 of the PSR notes that the Defendant's parents returned to China at the end of 2024. To clarify, the Defendant's parents traveled to China in late 2024 in order to visit family members. While there, the Defendant's mother grew ill with shingles. She is currently being treated in China. However, the Defendant's parents plan to return to the United States (and resume living with the Defendant) in the near future.

In addition, Paragraph 72 states that the Defendant's parents are unaware of the instant case. Mr. Jiang has recently informed his parents – in general terms – that he is facing legal difficulties in the United States arising from his pharmacy business.

Paragraph 74

Paragraph 74 describes a corroborative telephone interview with the Defendant's wife, and relates information provided by Ms. Piao. Among other things, it states that when the Defendant was in high school, his mother had bone surgery "in the lake." We believe that Ms. Piao was attempting to communicate that the Defendant's mother underwent *leg* surgery. We understand that the Defendant's mother suffered from a medical condition which caused bone growths and required surgical intervention.

Paragraph 82

The Defendant confirms that, as a teenager, he saw a therapist because he was feeling depressed. He relates that the treatment was not extensive; he only recalls seeing the therapist on one occasion, which is why he did not mention it during his interview.

Paragraph 91

Paragraph 91 relates to the Defendant's partial ownership of Silver Care Services, LLC. The Defendant did not mention Silver Care Services during the presentence interview because it is merely a holding a company and assets were not discussed. As noted in the PSR, information regarding this entity was fully set forth in the Defendant's Financial Disclosure Form.

To clarify, Silver Care Services, LLC is not co-owned by Joby Aviation or Tesla. Rather, the company has a stock account in its name at Fidelity, which holds stock in Joby and Tesla. As related in the Defendant's Financial Disclosure Form, the Fidelity account holds 14,950 shares of Joby Aviation and 2,000 shares of Tesla. At the time, the former was valued at $6.56 per share, while the latter was valued at $287.51 per share. The Defendant and Taesung Kim have agreed to forfeit the contents of this stock account to the Government.

In addition to the stock account, Silver Care Services, LLC owns a building located at 418 North 6th Street in Prospect Park, New Jersey. The Defendant effectively owns a 33% share of this real property. The property is also being sold to satisfy the Defendants' forfeiture obligations.

Paragraph 94

During the referenced time period of 2018 to 2019, the Defendant worked part-time at a restaurant.

Paragraph 95

The Defendant was employed at Pro Care, Inc. from February 2014 to approximately May *2018* (not 2014).

Paragraph 98

Assets

The PSR describes the value of the Silver Care Services, LLC stock account at Fidelity as "unknown." As set forth in the Defendant's Financial Disclosure Form and noted above, this account holds 14,950 shares of Joby Aviation and 2,000 shares of Tesla. When the financial statement was prepared, the Joby stock was worth $98,072 while the Tesla stock was worth $575,020, for a cumulative value of $637,092.

Similarly, the Webull stock account holds 23,649 shares of Joby Aviation. At the time of the Defendant's Financial Disclosure Form, that stock was valued at $155,137.44.[5]

Obviously, these values are subject to fluctuation based upon stock prices. As noted in the PSR, both the Fidelity and Webull accounts are being forfeited to the Government.[6]

---

[5] Footnote 10 of the PSR states that Joby Aviation owns 23,649 shares of the Webull stock account. This appears to be based upon a misinterpretation of the Defendant's Financial Disclosure Form. To clarify, the Webull stock account holds 23,649 shares of Joby Aviation – and not *vice versa*.

[6] As of today's date, the Fidelity account holds $198,685.50 of Joby stock and $658,820 of Tesla Stock, for a total value of $857,505.50. Feng's 50% interest in this account is worth $428,752.75. The Webull account hold $314,395.21 of Joby stock and is owned entirely by Feng.

Monthly Expenses

Footnote 13 of the PSR notes that the Defendant listed a monthly expense for car insurance, but neglected to describe the automobile in question. We apologize for the oversight. The referenced insurance is paid in connection with Ms. Piao's car, which was inadvertently omitted from the Defendant's financial statement. The vehicle is a 2020 Mercedes Benz GLE 350 with approximately 20,000 miles on the odometer, valued at approximately $25,000.

Footnote 14 of the PSR notes that the Defendant also neglected to furnish documentation regarding his credit card debt. A statement from April of 2025, which has been furnished to Probation, reflects a balance of $1,034.73. Again, we apologize for the oversight.

Finally, Footnote 15 of the PSR notes that the Defendant listed $2,000 per month under "Alimony/Child Support." This figure actually represents the monthly tuition at Eli's school. It should have been listed under "other" expenses.

As noted by the PSR, the Defendant's expenses exceed his income. The Defendant and his wife are currently supporting themselves on her salary, while also relying upon their savings and incurring debt.

Paragraph 100

The 2011 Toyota Camry referenced in this paragraph was traded-in approximately five years ago to purchase the 2020 Mercedes referenced above.

## VI. Sentencing Guidelines

The applicable Guidelines section for Money Laundering Conspiracy is U.S.S.G. § 2S1.1. Under that section, the Defendant's base offense level is determined by reference to the underlying offense from which the laundered funds were generated. As a result, the base offense level is determined by reference to the Fraud Guidelines under U.S.S.G. § 2B1.1. The Government, Probation, and defense agree that the Guideline calculation for the instant offense is as follows:

| | |
|---|---|
| Fraud Base Offense Level (U.S.S.G. § 2B1.1[a][2]) | 6 |
| Loss in excess of $9,500,000 (U.S.S.G. § 2B1.1[b][1][K]) | +    20 |
| Money Laundering Base Offense Level per U.S.S.G. § 2S1.1(a)(1) | 26 |
| Conviction under 18 U.S.C. § 1956 (U.S.S.G. § 2S1.1[b][2][B]) | +    2 |

10

| | | |
|---|---|---|
| Zero Point Offender Reduction (U.S.S.G. § 4C1.1) | - | 2 |
| Acceptance of Responsibility (U.S.S.G. § 3E1.1(a) and (b) | - | 3 |
| Global Point Reduction | <u>-</u> | <u>1</u> |
| Total Adjusted Offense Level | | 22 |

Because Mr. Jiang has a criminal history category of I, the foregoing calculations produce a Guideline sentencing range of 41 to 51 months' imprisonment. As set forth below, however, we respectfully submit that a consideration of the factors set forth in 18 U.S.C. §3553(a) support a below-Guidelines sentence.

## VII. **Request for a Below-Guidelines Sentence**

As set forth above, the United States Sentencing Guidelines recommend a sentence between 41 and 51 months. But as the Court is aware, that recommendation is purely advisory. *See United States v. Booker,* 543 U.S. 220 (2005). Indeed, as the Supreme Court emphasized in *Gall v. United States,* 128 S. Ct. 586 (2007), the applicable Guidelines range should not even be considered *presumptively* reasonable for a given defendant:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, *[s]he may not presume that the Guidelines range is reasonable*. [S]he must make an individualized assessment based on the facts presented.

*Id.* at 596 (internal citation and footnote omitted) (emphasis added).

In making such an individualized assessment, the Court is required to first consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Having given due consideration to these factors, the "parsimony provision" of § 3553 directs the Court to impose a sentence which is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." This includes the need for the sentence imposed:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Finally, § 3553 further directs sentencing courts to consider:

(3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established…by the [sentencing] guidelines...(5) any pertinent policy statement [of the Sentencing Commission]; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

*See* 18 U.S.C.A. § 3553 (a)(3)-(a)(7).

In the instant case, we respectfully submit that the ends of justice and policy considerations of § 3553 (a) can be satisfied by a sentence well below the advisory range. Indeed, we believe that as it relates to Feng in particular, such interests could be served by a non-custodial sentence.

We cannot escape the fact that the offense conduct here is serious. However, as in any fraud-based case, the advisory guidelines are largely driven by loss – a rough proxy for culpability, which can obscure as much as it reveals. *See United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (criticizing "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense."). Here, we believe the loss figure, considered in a vacuum, significantly overrepresents the seriousness of the offense as it relates specifically to Feng and his culpability for it.

Feng has stipulated that the Defendants' pharmacies submitted over $9,500,000 in improper claims to Government healthcare plans, and he acknowledges the $24 million loss figure cited by the Government and Probation. It is important to recognize, however, that the benefit to Feng was nowhere near that figure, which represents the gross amount billed to the Government, not Feng's profit. Furthermore, as it relates to Feng, this is not a case where medications were billed to the Government without being provided to the patients. When patients presented him with a prescription, Feng provided the customers with the medications. As he has acknowledged, financial incentives were being paid to both doctors and customers – a practice which creates the moral risk of overprescription, and which automatically renders such prescriptions unlawful. However, Feng is not in a position to say which percentage of such prescriptions were medically

unnecessary.  In fact, Feng serviced many legitimate customers in his community for all kinds of issues and ailments and incurred the usual expenses of running a business, including the cost of goods, overhead and staffing.  As a result, his net profits were far below the gross cost to the Government from which the Guideline calculations are derived.  We respectfully submit that the Guidelines' loss amount and the resultant, 20-level increase in Feng's offense level substantially overstates his actual culpability.

Furthermore, in assessing such culpability, we respectfully ask the Court to carefully consider Feng's role and how he came to be involved in the offense conduct.  Feng did not set out to engage in fraud.  When he borrowed money and staked his family's future on Elmcare, he knew nothing of the pharmacy industry or the practices which would eventually lead to his indictment.  As noted above, he started out as one of several passive investors in the business and hitched onto a person that had experience in the pharmacy industry and was seemingly legitimate and successful at it.  He was not the architect of Elmcare's kick-back practice or of the overall fraudulent scheme in general, which existed well before he took on an active role.  In fact, Feng only became aware of and involved in such conduct after he was unexpectedly thrust into the day-to-day operations of the pharmacy, following Tony's abrupt departure.  At that juncture, Feng was desperate to revive the flagging business and save his family's investment.  While he should have ended the kickback practice then, he chose instead to continue on the same path, engaging in the practices which were already in place and common within the close-knit Chinese communities of Queens and Brooklyn, and primarily being orchestrated and carried out by Mr. Kim.  Regrettably, under pressure, he chose expedience over ethics.

As a result of that poor decision, Feng now stands before the Court convicted of a felony.  After five years of grueling work and long hours, he has agreed to forfeit an amount approximately equal to everything he made from the pharmacies, including virtually all of his assets, placing his family in dire financial straits.  Worse yet, he will be subject to a mandatory restitution order of more than $24 million – a judgment that will impose a crippling debt burden on Feng's family, and which will likely endure for the rest of his life.  In this regard, the financial consequences of Feng's conviction far outweigh the benefits received, sending a clear message to anyone who might be inclined to engage in such practices and providing a clear incentive for Feng to respect the law, which he has otherwise done his entire life.

Consequences aside, Feng is profoundly remorseful for his conduct.  His wife, father, and sister all describe his profound sense of shame.  Indeed, during his interview with Probation, Feng expressed his occasional and fleeting thoughts of ending his life since this case began.  While I do not believe that feng is an actual suicide risk given his devotion to his family, I do believe that the strong emotions he has experienced since his arrest speak to the depth of his self-recrimination and remorse.

In short, I believe that Feng is a young and humble man who is capable of and committed to learning from his transgressions. He has strong familial support and no prior criminal history. The offense conduct was limited to his involvement in the pharmacy business, in which he had no prior experience, and this activity was in existence before his arrival. He no longer has any involvement in the pharmacy business and is forfeiting virtually everything he made from it. He deeply appreciates the consequences of his actions and the personal and financial burden they have created for him and his family. All of these things lead me to believe that Feng is not a person who is likely to reoffend.

Accordingly, I respectfully submit that a sentence of incarceration is not necessary to protect the public or deter Feng from future criminal conduct. Instead, I respectfully submit that the policy considerations of § 3553(a) could be satisfied in this case by a sentence of Probation (with conditions which the Court deems appropriate), combined with community service, restitution, and forfeiture. Such a sentence will allow him to close this regrettable chapter in his life and begin rebuilding it, while continuing to care and provide for his young son, niece and parents, all of whom are at vulnerable ages and depend upon him daily for support.

## VIII. Conclusion

For the foregoing reasons, we are respectfully asking the Court to temper justice with mercy by sentencing Mr. Jiang to a non-custodial sentence.

Respectfully submitted,

/s/

David Smith, Esq.

Enc.

cc: AUSA Patrick J. Campbell (via ECF)
Probation Officer Alexandria M. Lohwasser (via e-mail)