

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JRS:PJC
F. #2021R00440

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 9, 2025

<u>By ECF</u>

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:     United States v. Feng "Jeff" Jiang
>         <u>Criminal Docket No. 24-264 (ARR)</u>

Dear Judge Ross:

Feng Jiang has been described by a co-conspirator as the "left hand" in the management of a large-scale conspiracy to defraud Medicare through the dispensing of medically unnecessary prescription medications, the payment of kickbacks to induce Medicare beneficiaries to use conspirators' pharmacies, and the laundering of funds to pay kickbacks and extract profits from the pharmacies. Through their collective actions, Jiang and his co-conspirators caused in excess of $24 million in losses to Medicare, money intended for the elderly and the neediest among us.

On September 16, 2025, the Court will sentence Jiang in connection with his plea to conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). The government respectfully submits this letter in response to Jiang's sentencing submission. (ECF No. 37, the "Jiang Submission".) Considering the seriousness of the offense, the harm caused to the federal health care program, the significant need for deterrence, and the need to avoid unwarranted sentencing disparities, the government respectfully submits that a sentence within the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 41 to 51 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing. <u>See</u> 18 U.S.C. § 3553(a). The government also respectfully requests that the Court order Jiang to pay restitution in the amount of $24,411,567.11 to Medicare and enter a forfeiture money judgment of $2 million, as agreed to in the plea agreement.

I.      <u>Background & Procedural History</u>

Medicare and Medicaid are vital federal health care programs that provide insurance coverage to the elderly and those who cannot afford health insurance. (Presentence

Investigation Report ("PSR") ¶¶ 5-11.) This coverage includes prescription drug coverage, and, in some instances, a monthly credit for over-the-counter ("OTC") items, which ranges from approximately $100-$200. (See id. ¶ 12.) The monthly OTC credit can be used to purchase OTC items, such as bandages, vitamins, and OTC pain relievers. OTC transactions are processed by scanning the eligible items at a register and swiping the OTC card to deduct payment, similar to using a pre-loaded debit card. (Id.) If the OTC credit goes unused, it is forfeited at the end of the month. (Id.) By submitting claims, pharmacies certify that the items were actually dispensed, were medically necessary, and were not induced by kickbacks and bribes. (Id. ¶ 14.)

As charged in the indictment and outlined in the PSR and its addendum, between approximately 2019 and December 2022, Jiang and his co-conspirators, including Taesung "Terry" Kim and Dacheng Lu, conspired to defraud federal health care programs by submitting claims for medically unnecessary prescription drugs and OTC items that were not dispensed, procuring those claims through bribes and kickbacks, and laundering the proceeds of the fraud to disguise the kickbacks. (See id. ¶ 35.) As part of the scheme, Jiang and his co-conspirators directed employees to refer customers to specific medical practices for prescriptions that the pharmacies could dispense in exchange for kickbacks to the customers. (Id. ¶ 36.)

Co-conspirator Hua Huang's experience working at Elmcare Pharmacy Inc. ("Elmcare") and NY Elm Pharmacy Inc. ("NY Elm"),[1] entities in which Jiang had an ownership interest, is emblematic of the operation of Jiang and Kim's pharmacies. A regular part of Huang's job was providing kickbacks and bribes to customers in exchange for them bringing profitable podiatry prescriptions to the pharmacies, which were often prescribed by doctors to whom Huang and other employees referred customers at their bosses' direction. The kickbacks and bribes took two forms: supermarket gift certificates, which were provided to the customers for specific profitable podiatry medications, and cash, which was provided for the entire balance of the customers' OTC card. (Id. ¶ 38.)

A confidential witness's ("CW") interactions with Huang and other Elmcare and NY Elm staff are representative of the customer experience at the pharmacies in this network, as confirmed by multiple cooperators in this case. When the CW went to Elmcare in November 2021, he/she approached Huang and began the conversation by asking what benefits he/she would receive if he/she brought prescriptions to Elmcare.[2] Huang told the CW that he/she "need[ed] to see our doctor," and "if there are foot doctor medications, I can give you $3 each prescription. Without foot doctor medications, nothing." When the CW showed Huang his/her OTC card and asked about it, Huang said, "we can give you . . . whatever is on there." She then promised to swipe his/her OTC card and provide $150 cash, but only "after you see the podiatrist."

The CW returned to Elmcare in December 2021. During that visit, Huang asked if the CW had seen a specific doctor to which the pharmacy referred him/her. When the CW said

---

[1]     When Elmcare lost its main prescription drug insurance contract, it rebranded as NY Elm with new ownership on paper.

[2]     The CW's visits to Elmcare and NY Elm were video and audio recorded and translated from Mandarin to English by an agent fluent in both languages.

no, Huang told the CW, "we have someone that will bring you." The CW asked again about the OTC card, and Huang told the CW, "go see the doctor first." Another Elmcare employee then filled out the doctor's patient intake paperwork for the CW before walking the CW to the doctor's office. When the CW walked back to Elmcare, he/she provided a prescription for medically unnecessary prescription shoes to Huang, which Huang said she would submit, and she handed the CW an envelope containing $150 cash from his/her OTC card.

The CW returned to Elmcare in January 2022. During that visit, Huang gave the CW supermarket coupons for each of the podiatry medications prescribed in December 2021 through the pharmacy's doctor and $155 in cash for the CW's OTC card. The CW asked Huang if he/she could leave the drugs, implying he/she did not need them, and Huang told the CW "if you leave it, I'm going to throw it out, either you throw it out or I throw it out." The CW then asked about exchanging the drugs, again implying they were unnecessary, but Huang said no. Huang did not attempt to reverse the prescriptions or alert the pharmacist that they were unnecessary.

When the CW visited Elmcare again in November 2022, it had by then become NY Elm. The CW asked Huang if the benefits, including the supermarket gift certificates and OTC cash, remained the same, and she confirmed that they did. The CW gave Huang his/her OTC card, and Huang confirmed it had $155 on it, but she refused to provide the CW with cash for the OTC card because he/she had not recently sent prescriptions to the pharmacy.

When Elmcare closed and became NY Elm, Jiang signed a New York State Board of Pharmacy document falsely indicating that Elmcare's customers would be transferred to Silver Care Pharmacy, another pharmacy in which Jiang had an ownership interest and that was within the same network. (ECF No. 1 (the "Indictment"), ¶ 31(e).) In reality, as Huang explained to the CW, Elmcare became NY Elm and the patients stayed in place, skirting the restrictions imposed by the insurance companies that wished to cease doing business there.

The total amount of money misappropriated from Medicare through the scheme was at least $24 million. (PSR ¶ 43.)

In December 2022, and concurrent with Huang's arrest, law enforcement searched NY Elm and three other pharmacies in the same network. During that search, agents recovered thousands of dollars in cash in an unplugged refrigerator below the front counter, cash in prepared envelopes consistent with what Huang provided the CS for his/her OTC card, thousands of dollars in supermarket gift certificates to various supermarkets, intake forms for a nearby podiatry doctor who was a top prescriber at Elmcare and NY Elm, and numerous customers' OTC cards.

Between October 2015 and December 2022, Jiang and his co-conspirators wrote numerous checks to "trading" companies that created the appearance of legitimate business but were instead used to obtain cash to sustain the kickback payments and withdraw cash from the scheme. (PSR ¶ 44.) Jiang opened certain bank accounts and signed certain of these checks himself in 2020 and 2021. (Indictment, ¶ 31(c), (d).)

On June 26, 2024, Jiang was arraigned on an indictment charging him with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, conspiracy to defraud the United States and pay health care kickbacks, in violation of 18 U.S.C. § 371, conspiracy to

commit money laundering, in violation of 18 U.S.C. § 1956(h), and money laundering, in violation of 18 U.S.C. §1956(a)(1)(B)(i). (See Indictment.) On January 10, 2025, Jiang pleaded guilty to conspiracy to commit money laundering. (PSR ¶ 1.).

II.     Jiang's Guidelines Range

The PSR correctly calculates Jiang's Guidelines range as follows:

| | |
|---|---|
| Base offense level (U.S.S.G. §§ 2X1.1, 2B1.1(a)) | 6 |
| Loss exceeding $9.5 million (U.S.S.G. §§ 2B1.1(b)(1)(K)) | +20 |
| Conviction under 18 U.S.C. § 1956 (U.S.S.G. § 2S1.1(b)(2)(B)) | +2 |
| Zero-point offender (U.S.S.G. § 4C1.1) | -2 |
| Acceptance (U.S.S.G. § 3E1.1(a),(b)) | -3 |
| Global resolution | <u>-1</u> |
| Total adjusted offense level | <u>22</u> |

(PSR ¶¶ 55-64, 121.) Based on Criminal History Category I, Jiang's Guidelines range is 41 to 51 months' imprisonment. Jiang agrees with this calculation.

III.    A Guidelines Sentence Is Appropriate

A.     Legal Standard

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light of other statutory concerns. 543 U.S. 220, 245 (2005); see 18 U.S.C. § 3553(a). Subsequent to Booker, the Second Circuit has held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Although the Second Circuit declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, it cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

Subsequently, in Gall v. United States, 552 U.S. 38 (2007), the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall, 552 U.S. at 49 (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine

4

whether they support the sentence requested by a party. In so doing, [the Court] may not presume that the Guidelines range is reasonable. [The Court] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides numerous factors that the Court must consider in sentencing the defendant. These factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to (a) reflect the seriousness of the offense, to promote respect for the law and to provide just punishment, (b) afford adequate deterrence to criminal conduct, (c) protect the public from further crimes of the defendant, and (d) provide the defendant with appropriate education or vocational training; (3) the kinds of sentences available; (4) the Guidelines range; (5) pertinent policy statements of the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution.

B.    Application of Law

The government respectfully requests that the Court impose a sentence within the Guidelines range of 41 to 51 months' imprisonment because such a sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing. See 18 U.S.C. § 3553(a). Specifically, the circumstances in this case, the history and characteristics of the defendant, the need to promote respect for the law and provide just punishment, the need to avoid unwarranted sentencing disparities among defendants charged in this scheme and sentenced nationally, and the need for specific and general deterrence warrant a Guidelines sentence.

1.    The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant Warrant a Guidelines Sentence

The nature and circumstances of the offense warrant a Guidelines Sentence. Jiang was the number two in command of a large-scale pharmacy fraud scheme that spanned Brooklyn and Queens. Pharmacies within Kim and Jiang's network paid large volumes of cash and supermarket gift certificates to customers as incentives to induce them to fill profitable and medically unnecessary prescriptions. The pharmacies focused on profits over patients, as evidenced by the interactions between the CW and pharmacy staff outlined above, which reduced the customer experience to a quid pro quo and outright theft from federal health care programs.

To prop up a large-scale kickback operation in pharmacies that do not generate cash, Jiang and his co-conspirators resorted to using third parties to turn reimbursement deposits into untraceable cash. Jiang personally wrote some of the checks to "trading" companies that had no business with the pharmacies and delivered the cash to the pharmacies for dispensing to the customers. As an owner, Jiang was not generally directly dealing with customers. Instead, he and his co-conspirators directed low-level employees, like Hua Huang, to act as the front line and steer patients, promise them kickbacks for expensive drugs, and handle the kickback payments.

The history and characteristics of the defendant also warrant a Guidelines sentence. While the Jiang Submission categorizes the decision to continue paying kickbacks in the pharmacies when Jiang assumed control in 2019 as one of business necessity, see Jiang Submission at 4, there was another obvious choice: cease the unlawful conduct. But Jiang persisted. He

stepped up from being a "passive investor" to an active participant in the fraud, directing others to carry out the day-to-day functions of the pharmacy. At its heart, however he may try to recharacterize it now, his fundamental motive was greed. And importantly, the events of this case did not occur over a brief period. Jiang pleaded guilty to engaging in the scheme over a period of roughly three years. Jiang's role in the offense and the duration of the conduct demonstrates the need for a Guidelines sentence.

        2.      <u>A Guidelines Sentence Appropriately Reflects the Seriousness of the Offense, Promotes Respect for the Law, and Provides Just Punishment</u>

The 3553(a) factors require that the punishment reflect the seriousness of the offense. No one disputes that laundering approximately $24 million in health care fraud proceeds is a serious crime. Annual losses tied to health care fraud are estimated to be in the tens of billions of dollars,[3] and Jiang's conduct is but one example of a serious societal problem. Health care fraud is unquestionably harmful, as it risks destabilizing a system that struggles with insolvency, degrades patient care and causes patient harm, and drives legitimate actors from the system while driving up costs for taxpayers. But money laundering exacerbates those harms by making health care fraud schemes harder to detect and fraud proceeds harder to recover.

A Guidelines sentence reflects the seriousness of the crime, promotes respect for the law, and provides just punishment. To allow a blatant bribery scheme and fraud like the one Jiang has been convicted of to be punished through only economic penalties like restitution—which Jiang appears to have no ability to satisfy—would grossly undermine the seriousness of the offense and send a message to the pharmacies on every corner in Brooklyn and Queens that crimes like this are worth committing because defendants are unlikely to face serious punishment. Indeed, courts and Congress have long indicated that white-collar crimes like Jiang's require meaningful punishment to outweigh the substantial incentives that exist to engage in such potentially lucrative conduct. <u>See</u> <u>United States v. Cavera</u>, 550 F.3d 180, 196 (2d Cir. 2008) (en banc) ("Where the profits to be made from violating a law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence."); <u>United States v. Heffernan</u>, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, C.J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); <u>see also</u> S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("The second purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white collar crime and government corruption. Major white collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.").

---

[3]      https://www.nhcaa.org/tools-insights/about-health-care-fraud/the-challenge-of-health-care-fraud/#:~:text=The%20National%20Health%20Care%20Anti-Fraud%20Association%20%28NHCAA%29%20estimates,the%20tens%20of%20billions%20of%20dollars%20each%20year (last accessed Aug. 28, 2025).

Evidence in this case suggests that the defendants viewed their conduct as less than serious. In a recorded conversation involving Kim, Jiang's partner and the co-owner of Elmcare and NY Elm whose case is also before this Court, Kim told his co-conspirators prior to their arrests, in sum and substance, that kickbacks were not a big deal, while expressing concern with being involved with money laundering. This conversation highlights the need for the Court to reaffirm that these are serious crimes with serious consequences.

3.     A Substantial Sentence Affords Adequate Deterrence and Protects the Public

A Guidelines sentence is necessary to deter others from engaging in similar schemes and to protect the public from the pilfering of vital, resource-limited public health programs. As the Second Circuit has noted, significant sentences are particularly appropriate in white collar crimes to promote general deterrence. See, e.g., United States v. Goffer, 721 F.3d 113, 132 (2d Cir. 2013) (noting that some feel that white collar crimes are a "game worth playing"). "'Persons who commit white-collar crimes like [d]efendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of punishments that may be imposed. A serious sentence is required to discourage such crimes.'" United States v. Vrancea, 136 F. Supp. 3d 378, 392 (E.D.N.Y. 2015) (quoting United States v. Stein, No. 09-CR-377, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010) (Weinstein, J.)); see also United States v. Marsh, No. 10-CR-480 (JBW), 2011 WL 5325410, at *1 (E.D.N.Y. Oct. 26, 2011) ("[I]ndividuals who engage in financial fraud can, at least in theory, be deterred by a substantial threat of penalties. Their actions are calculated. They choose to engage in white collar crime because they believe that the potential for significant financial benefits outweighs the risk that they will be punished.").

Further, health care fraud is a complicated crime involving difficult questions at the interstices of the medical and legal professions. For these and other reasons, the likelihood of detection is relatively low. See Diane E. Hoffmann, Physicians Who Break the Law, 53 St. Louis U.L.J. 1049, 1052 (2009) (pointing to empirical research showing that professionals believe the probability of getting caught committing a white-collar crime is low and that fraud is "relatively easy to hide and hard to detect" because the acts involved "tend to be made up of complex, sophisticated, and relatively technical actions" that are "intermingled with legitimate behavior" (internal quotations and citations omitted)). Indeed, Jiang and his co-conspirators went through the motions to create the appearance of legitimacy to the prescriptions being dispensed, having the CW see a doctor and receive prescriptions and scanning eligible OTC items to give the appearance that they were dispensed. Their pharmacies were just a handful among dozens of pharmacies in the same neighborhoods, and they simply changed names when they were caught. They also constructed a web of financial transactions to disguise the amount of money they were making and the amount of cash they were paying out as kickbacks. They wrote checks to "trading" companies that gave the appearance of doing real business, when in reality they were converting bulk cash for the payment of kickbacks.

Jiang and his co-conspirators likely calculated that the risks of going to these lengths were not outweighed by the potential punishment they could face. Indeed, Jiang was faced with calculating whether to continue the scheme in 2019 when he stepped into a more prominent management role and was tasked with making business decisions. His conviction demonstrates that his calculation was incorrect, but by imposing a Guidelines sentence, the Court will show

other would-be fraudsters that white collar crimes come with substantial penalties and are not worth the risk.  See Harmelin v. Michigan, 501 U.S. 957, 988 (1991) ("[S]ince deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties.").

Health care fraud is also not a victimless crime.  Money diverted through schemes like Jiang's depletes financial resources that would otherwise pay for legitimate health care services that the elderly and indigent desperately need.  Schemes like this also sap the resources needed to identify, investigate, and prosecute fraud schemes, while also driving up health insurance costs for other citizens.  Federal health care programs operate within a trust-based system because their significant volume of claims makes it impossible to pre-clear claims as they are submitted.  Individuals like Jiang and his co-conspirators abuse that trust for their own financial gain, making the system worse for all involved.  Finally, fraudulent pharmacies that submit claims for medically unnecessary prescriptions and attract customers through kickbacks corrupt the marketplace and drive out legitimate actors and aspiring business owners—which Jiang once was—making legitimate services harder to obtain.  Those who cannot compete with competitors who operate fraudulently then turn to fraud themselves, thus perpetuating the cycle.  A Guidelines sentence will deter others and help break the cycle.

And again, Jiang participated in this scheme for years, repeatedly choosing to take part in a criminal enterprise.  His willful and knowing decision to engage in such criminality to line his pockets suggests that a meaningful sentence is necessary to deter him from future criminality.  A Guidelines sentence will signal to Jiang and other pharmacy fraudsters that these schemes carry more punishment than just the potential requirement to repay the fraud proceeds if one is caught, which is no punishment at all in cases where defendants, like Jiang, cannot afford to pay a substantial judgment or have already dissipated the fraud proceeds.

4.   A Guidelines Sentence Is Necessary to Avoid Unwarranted Sentencing Disparities

A Guidelines sentence is also necessary to avoid unwarranted sentencing disparities in this case, this district, and nationally.  Most relevant, Huang, who was a low-level employee in the scheme and whose conduct is discussed above, received a sentence of two years' probation. See United States v. Huang, No. 23-CR-234, ECF No. 47.  As an owner and manager, Jiang's conduct warrants a Guidelines custodial sentence.

Such a sentence would be in line with similar cases in the district.  Indeed, in a similar and recent case involving supermarket gift certificate kickbacks and bribes paid to pharmacy customers for medically unnecessary prescriptions, Judge Gonzalez sentenced a defendant who paid kickbacks to customers to 30 months' imprisonment.  See United States v. Chen, No. 23-CR-255 (HG).  Notably, Chen had the same approximate loss, more than $9.5 million, attributed to her for purposes of the Guidelines.

Numerous other cases in this district involving fraudulent pharmacy claims for items that were not provided have resulted in significant custodial sentences.  For example, in a scheme in this district involving claims for expensive drugs that were not dispensed, the defendant pharmacist and pharmacy owner received a sentence of 78 months' imprisonment.  See United

States v. Mohammed, No. 18-CR-589, No. 20-CR-581 (ENV).[4]  In another case in this district that involved claims for drugs that were not provided to beneficiaries, a pharmacist and pharmacy owner was sentenced to 30 months' imprisonment.  See United States v. Sabet, No. 21-CR-140 (EK).[5]  In yet another pharmacy case in this district, a pharmacist and a pharmacy owner were sentenced to 15 and 18 months, respectively, for submitting claims for expensive drugs that were not dispensed.  See United States v. Basta, No. 22-CR-219 (EK).[6]

Federal sentencing statistics also show that a Guidelines sentence is appropriate. For the fiscal years 2020 through 2024, of the approximately 457 defendants whose Guidelines were based on a Total Offense Level of 22, a Criminal History Category I, and whose primary Guideline was Section 2B1.1, the average length of imprisonment was 33 months and the median length of imprisonment was 35 months.[7]  These figures are slightly below Jiang's Guidelines of 41 to 51 months, possibly because most of that time period preceded implementation of the zero-point offender Guideline, which likely skews the averages lower than they otherwise would be.

The above cases demonstrate the prevalence of this type of fraud in the district, and they show that a Guidelines sentence is appropriate to avoid unwarranted sentencing disparities.

IV.    Restitution

Under 18 U.S.C. § 3663A, the Court must impose restitution.  In United States v. Zangari, 677 F.3d 86, 93 (2d Cir. 2012), the Second Circuit held that restitution must be measured according to the victim's actual loss, not the defendant's gain.  Moreover, in calculating restitution, "these losses need not be mathematically precise," and "[a] reasonable approximation will suffice, especially in cases in which an exact dollar amount is inherently incalculable."  United States v. Rivernider, 828 F.3d 91, 115 (2d Cir. 2016) (internal quotation marks omitted).  The government respectfully submits that the Court should order Jiang to pay restitution in the amount of

---

[4]    The Mohammed cases involved some aggravating factors, most notably that the defendant opened another fraudulent pharmacy and continued submitting fraudulent claims for drugs that were not dispensed while she was on pretrial supervision following her arrest for the same conduct.  The defendant was also a licensed pharmacist.  On the other hand, her schemes involved approximately $4.9 million in loss over an almost five-year period, far less than the loss here.

[5]    The Sabet case involved approximately $7 million in loss over a multi-year period and through multiple fraudulent pharmacies.

[6]    Although drugs that Jiang's pharmacies billed to Medicare were generally dispensed, OTC items exchanged for cash were not dispensed.  Further, the loss to Medicare in this case is attributable to prescription drug claims for a select number of drugs for which the pharmacies were paying kickbacks and steering patients to obtain prescriptions for, which demonstrates the lack of medical necessity for these drugs.

[7]    U.S. Sentencing Commission, Judiciary Sentencing Information (JSIN), available at https://jsin.ussc.gov/analytics/saw.dll?Dashboard.  (last visited Sept. 9, 2025).

$24,411,567.11 to Medicare, which represents the amount of money Medicare paid for medications that were medically unnecessary and induced by the payment of kickbacks and bribes. Restitution should be joint and several with his co-conspirators. Jiang agreed to this restitution figure in his plea agreement. (Plea Agreement ¶ 1(e).) The Court should also impose a forfeiture money judgment in the amount of $2,000,000, as agreed to in Jiang's plea agreement. (Id. ¶¶ 6-12.)

V.     Conclusion

        For the foregoing reasons, and based on a balancing of the Section 3553(a) factors, the Court should impose a sentence of 41 to 51 months' imprisonment and order Jiang to pay restitution and forfeiture.

                                        Respectfully submitted,

                                        LORINDA LARYEA
                                        Acting Chief, Fraud Section
                                        Criminal Division
                                        U.S. Department of Justice

                                        JOSEPH NOCELLA, JR.
                                        United States Attorney
                                        Eastern District of New York

                        By:      /s/_____
                                        Patrick J. Campbell
                                        Trial Attorney, Fraud Section
                                        Criminal Division
                                        U.S. Department of Justice
                                        (202) 262-7067

cc:     Clerk of Court (ARR) (via email)
        David Smith, Esq. (via ECF)
        Maxine Marquez, U.S.P.O. (via email)